## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **PERRY SMITH** | : | **No. 04-472-1** |

## MEMORANDUM

PRATTER, J.                                                    DECEMBER 15, 2020

Perry Smith seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Smith requests relief based on the COVID-19 pandemic and his asthma diagnosis, which he believes places him at increased risk of harm from the disease. The Government opposes Mr. Smith's *pro se* motion, given the danger he presents to the community and that his mild asthma does not constitute an extraordinary and compelling reason to justify his release. For the following reasons, the Court denies the motion.

### BACKGROUND

### I.        Mr. Smith's Criminal Conduct

Mr. Smith was convicted of one count of conspiracy to commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; one count of Hobbs Act Robbery, and aiding and abetting of same, in violation of 18 U.S.C. § 1951; and using and carrying a firearm during a crime of violence, and aiding and abetting of same, in violation of 18 U.S.C. § 924.

Seventeen years ago, Mr. Smith and his co-defendant, Kevin Cleveland, robbed the Shernoff Salads Company, which manufactures deli salads. Shernoff Salads mainly supplies supermarkets and large-scale distributors. So it does not carry much cash. Nevertheless, during the armed robbery, Mr. Smith and Mr. Cleveland brandished firearms, threatened to kill Mr. Shernoff—the owner—while holding a gun to the side of Mr. Shernoff's head, and shot

Mr. Shernoff's secretary in the abdomen.  They then fled.  Mr. Smith and Mr. Cleveland stole roughly $1,400.

Mr. Smith was sentenced to 260 months imprisonment, to be followed by five years of supervised release.  He was also ordered to pay restitution of $1,100, a $1,100 fine, and a $100 special assessment.  Mr. Smith is serving his sentence at FCI Fairton in New Jersey with an anticipated release date of March 8, 2023.  He has incurred a significant disciplinary record, including repeated infractions for drugs or alcohol, and possession of a hazardous tool—a sharpened metal object.

## II.    Mr. Smith's Request for Compassionate Release and Medical Records

On July 29, 2020, Mr. Smith requested compassionate release from the warden of the facility where he is confined.  Before the requisite 30-day exhaustion window had passed, Mr. Smith filed a motion with this Court.  Because he had not yet exhausted his administrative remedies, the motion was not yet ripe.  18 U.S.C. § 3582(c)(1)(A).  The warden denied his request on August 10, 2020 so the Court will now consider his motion.  Mr. Smith seeks relief based on his mild asthma and his fear of contracting COVID-19 while incarcerated.

Mr. Smith's medical records for the past year reveal that he had asthma, which is now in remission.  Earlier this year, Mr. Smith informed a treating medical professional that he was not having troubles with his asthma.  He stated that he used an inhaler only when exercising. Mr. Smith does have a hernia, but his condition is currently monitored and controlled with medical supplies provided by the Bureau of Prisons ("BOP").  He is reportedly ambulatory and engages in all normal activities of daily living within the prison.

### III.    BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge.  Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2]  The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies.  In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan.  The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  BOP has limited the movement of inmates and detainees among its facilities.  Moreover, official staff travel has been suspended, as has most in-person staff training.  BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return.  Newly admitted inmates are screened for COVID-19 exposure risk

---

[1]      BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Dec. 14, 2020).

[2]      BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 14, 2020).

factors and symptoms.  Asymptomatic inmates are placed in quarantine for at least 14 days or until

cleared by medical staff.  Symptomatic inmates are placed in medical isolation until they test

negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release

from isolation.  The Program Review Division will conduct unannounced site visits to ensure

compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority

to place eligible prisoners in home confinement.[3]  Pursuant to the Coronavirus Aid, Relief, and

Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for

which the Director is authorized to place a prisoner in home confinement" in the event the Attorney

General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L.

No. 116-136 § 12003(b)(2).  In April 2020, the Attorney General gave the Director of BOP the

authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence

of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19

transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to

adjust its practices accordingly to maintain the safety of prison staff and inmates while also

fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Mr. Smith currently lives at FCI Fairton.  As of December 14, 2020, the facility reports

that 13 inmates and three staff members are currently COVID-positive.  Overall, at this facility,

95 inmates and 17 staff members previously positive for COVID-19 have since recovered.[4]  There

---

[3]      This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

[4]      The data is current as of December 14, 2020, according to the BOP website, available at https://www.bop.gov/coronavirus.

have been no deaths from the disease at Fairton.  The facility reports that it tested almost every inmate after a small breakout and has implemented strict quarantining procedures.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007).  However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction.  Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is

---

[5]    "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[6]    The Government does not contest that Mr. Smith has now met the exhaustion requirement.

[7]    Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020).  Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

The Court takes the critical health risk posed by the COVID-19 pandemic seriously.  But as concerning as the current pandemic is, resolving Mr. Smith's motion still calls upon the Court to take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Smith argues that he should be immediately released given his asthma, his rehabilitative efforts, and his fear of contracting COVID-19 while incarcerated.  These are not extraordinary and compelling reasons which justify a reduction in his sentence.

The mere existence of the pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own.  *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[8] "While this court is not bound by the CDC's guidelines, it follows suit with many other district

---

[8]     *See People at Increased Risk*, Centers for Disease Control and Prevention (Nov. 30, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Dec. 14, 2020).

courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

As demonstrated by his medical records, there is no evidence that Mr. Smith, who is 43years old, suffers from a condition that is considered "high-risk." The CDC has recently revised its list of people with certain medical conditions who "are at increased risk of severe illness" from COVID-19.[9] The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. "Moderate to severe" asthma fall into this "might" category. This condition is not considered high-risk by the CDC.

Mr. Smith has not established that his asthma meets the clinical definition of "moderate to severe."[10] His medical conditions are monitored and appropriately managed with medication at Fairton. Mr. Smith's medical records reveal that his asthma is in "remission." And he has told medical professionals that he has no issues with asthma and only uses his inhaler when he exercises. Moreover, there is no evidence that he has ever sought or received treatment from an acute asthmatic episode.

Courts routinely deny motions for the extraordinary remedy of compassionate relief based on mild asthma. *See, e.g.*, *United States v. Vernon Gaskin*, No. CR 15-352, 2020 WL 7263185 (E.D. Pa. Dec. 9, 2020) (denying release to defendant without daily asthmatic symptoms who did not use his inhaler daily); *United States v. Slone*, No. CR 16-400, 2020 WL 3542196 (E.D. Pa.

---

[9]     *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 14, 2020).

[10]    The United States Department of Health and Human Services describes asthma as "moderate persistent" when any of the following are true:  symptoms occur daily; symptoms limit normal activity; symptoms at night occur once a week; and lung function tests are abnormal.  Department of Health and Human Services, *Asthma Care Quick Reference:  Diagnosing and Managing Asthma* (Sept. 2012), available at https://www.nhlbi.nih.gov/sites/default/files/media/docs/12-5075.pdf (last visited Dec. 14, 2020).

June 30, 2020) (defendant's mild asthma, without other medical risk factors, did not constitute "extraordinary and compelling" circumstances); *United States v. Towel*, No. CR 17-519-6, 2020 WL 2992528 (E.D. Pa. June 4, 2020) (denying release to defendant with mild, exercise-induced asthma, which was managed with limited use of inhaler); *U.S. v. Rodriguez*, No. 16-167, 2020 WL 1866040 (S.D.N.Y. Apr. 14, 2020) (experiencing "reportedly well controlled" asthma while incarcerated during COVID-19 is "not enough" to justify compassionate release).

But even if Mr. Smith presented an extraordinary and compelling reason to warrant his release—which he does not—consideration of the § 3553(a) factors necessitates a denial of Mr. Smith's motion.  Mr. Smith continues to present a danger to the community.

Mr. Smith has failed to make any showing that an early release comports with the statutory sentencing factors.  Mr. Smith committed armed robbery, during which he and his co-defendant shot a woman in the abdomen and threatened to kill another person.  Nor was this Mr. Smith's first offense.  Instead, his multiple prior convictions for stealing motor vehicles, eluding the police, robbery, and possession of crack cocaine amounted to a criminal history category of VI—the highest category provided in the Federal Sentencing Guidelines.  And, Mr. Smith has demonstrated his disregard for court orders while on probation or parole.  In three of his five adult convictions, he committed various violations which led to revocation of his probation or parole and an increased sentence.

Mr. Smith has now indeed served the bulk of his sentence.  But his time while in custody is pockmarked with 27 disciplinary violations.  In the past five years alone, he has incurred infractions for possessing unauthorized items on several occasions, possessing marijuana paraphernalia and use of marijuana, possession of non-hazardous tool, and use of drugs and

alcohol.  This signals to the Court that Mr. Smith has not seriously made a substantive or in-depth attempt at rehabilitation.[11]

The Court will deny Mr. Smith's motion.  He does not present a definite health risk related to COVID-19 that would warrant release.  Nor does the violent nature of his crime suggest that the sentence imposed be shortened.  *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

CONCLUSION

For the foregoing reasons, the Court denies Mr. Smith's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[11]     To be sure, the Court certainly commends Mr. Smith for earning his GED while incarcerated and completing various programs offered at the facility.

10